IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Tammy L. Holley,  ) | Civil Action No. 6:13-2704-BHH-KFM |
| Plaintiff,  ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs.  ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant.  ) | |
| _____) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on July 2, 2010, alleging that she became unable to work on November 1, 2006. The applications were denied initially and on reconsideration by the Social Security Administration. On June 14, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, Ph.D., an impartial vocational expert, appeared at a video hearing on July

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

24, 2012, considered the case *de novo*, and on August 17, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. At the hearing, the plaintiff, through her attorney, amended her alleged onset date of disability to June 23, 2008. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on August 7, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

(2)    The claimant has not engaged in substantial gainful activity since June 23, 2008, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe combination of impairments: obesity, rheumatoid arthritis, fibromyalgia, and is status post right wrist carpal tunnel surgery (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work[2] as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). The claimant cannot climb, crawl, or kneel. She can perform no more than occasional fingering or fine manipulation with her dominant hand. Additionally, the claimant is allowed to exercise a sit/stand option at will.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, as well as sitting, standing, or walking for 6 hours each in an 8-hour workday.

2

(7)    The claimant was born on July 23, 1964, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from June 23, 2008, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

4

(4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### Medical Evidence

#### Carolina Spine Institute

On July 1, 1994, the plaintiff had an anterior cervical discectomy and fusion at C6-C7 (Tr. 270).  On March 30, 1998, the plaintiff underwent a right carpal tunnel release surgery (Tr. 285).  On January 20, 2003, the plaintiff returned to the institute with neck pain.  A left cervical epidural steroid injection was administered, which improved her pain, but her grip strength was diminished (Tr. 288-92).

#### Georgetown Memorial Hospital

On September 19, 2005, the plaintiff reported a several month history of hearing loss.  She had undergone a left tympanoplasty in 1978.  Terry L. Frye, M.D.,

5

diagnosed her with bilateral middle ear effusion with conductive hearing loss and planned to insert bilateral myringotomies with tubes (Tr. 293).  On November 6, 2009, the plaintiff reported to the Pain Center for numbness and weakness in her right arm.  Imaging from September 14, 2009, showed an interbody fusion at C6-7, moderate broad based disc bulge, osteophyte at C5-6 causing some flattening of the anterior thecal sac and cervical cord that was associated with bilateral neuroforaminal stenosis.  There was an anterior extradural defect at the C3-4 level.  The plaintiff had very poor posture, contracted pectoral muscles, rounded shoulders, and a protracted cervical spine.  She was scheduled for cervical epidural steroid injections, which were performed on November 9 and December 18, 2009 (Tr. 368-73).

### Georgetown Health Group - Lance A. Duvall, MD

On May 16, 2006, the plaintiff reported right hand and wrist pain to Dr. Duvall. She was wearing a wrist band and taking Aleve, but she stated the wrist band made the pain worse.  She had decreased hand strength (Tr. 335).  On September 27, 2006, the plaintiff reported fatigue and ear pain.  She had an apparent recurrent otitis (Tr. 337). On September 11, 2007, the plaintiff was seen for hypertension, gastroesophageal reflux disease ("GERD"), and possible rheumatoid arthritis ("RA"), for which she was seeing Mitch Twining, M.D., at Carolina Rheumatology.  She was taking Folate, Methotrexate, Lozol and Nexium (Tr. 342).  On October 26, 2007, the plaintiff reported left ear pain.  She had previous infections and had lost most of her hearing from the infections.  She also has a history of bruxism and possible temporomandibular joint ("TMJ") syndrome (Tr. 349).  On July 15, 2008, the plaintiff had problems with recurrent otitis media, with some decreased hearing.  It was noted that she had a speech impediment (Tr. 352).

### Carolina Rheumatology & Neurology - Mitch Twining, M.D.

On September 26, 2006, Dr. Twining wrote that a bone scan done on July 17, 2006, showed increased activity of both wrists and increased activity at all joints of both

hands.  The plaintiff described pain in both hands since March of 2006.  Both of her hands demonstrated synovitis over the metacarpophalangeal joints ("MCPs"), and the plaintiff had decreased grip strength.  Based on the bone scan and synovitis, a prednisone taper was started.  Dr. Twining strongly suspected RA (Tr. 299-301).  On October 10, 2006, x-rays showed mild bilateral degenerative arthritis of the plaintiff's fingers (Tr. 303).  On October 13, 2006, Dr. Twining stated that the plaintiff's history, presentation and bone scan were compatible with seronegative RA.  She was prescribed Methotrexate (Tr. 307).  On November 3, 2006, the plaintiff's hands demonstrated synovitis over the MCPs, and she had decreased grip strength (Tr. 309).

On February 7, 2007, The plaintiff continued to be treated with prednisone and Methotrexate.  Her sedimentation ("sed") rate was high at 40 (Tr. 318-19).  On May 9, 2007, Dr. Twining diagnosed the plaintiff with osteoarthritis in addition to RA.  She had pain in her right thumb and was prescribed Ultram (Tr. 323).  On April 18, 2008, x-rays revealed bilateral degenerative osteoarthritis (Tr. 332).  On May 27, 2008, the plaintiff reported pain in her left leg from her knee down to her foot.  She also had bilateral hand and wrist pain.  She received a corticosteroid injection in her left knee (Tr. 515-17).

During a visit to Dr. Twining on May 27, 2008, the plaintiff's fingers appeared normal; she had no synovitis in her hands bilaterally; her grip strength was normal; her cervical range of motion was normal, with full flexion/extension and rotation; she had no back abnormalities; her hip range of motion was normal; her knee range of motion was normal; her ankle was normal; her muscle strength was 5/5 in all groups tested; her muscle tone was normal; her deep-tendon reflexes were normal; and she had no neurological deficits (Tr. 516-17).

On June 23, 2008, Dr. Twining wrote a letter addressed "To whom it may concern," in which he opined that the plaintiff was disabled due to RA, which left her

7

incapable of prolonged standing or walking, grasping, pulling, stooping, bending, heavy lifting, kneeling, or squatting (Tr. 333).

On August 25, 2008, the plaintiff had pain in both hands. She was prescribed Ultram for her osteoarthritis. She received an injection in her right thumb (Tr. 521). The plaintiff received another injection in her thumb on November 21, 2008 (Tr. 525). On February 17, 2009, the plaintiff had leg pain, which was possibly related to her lumbar spine (Tr. 528).

On September 8, 2009, Dr. Twining noted the plaintiff's arthralgias, RA, and morning stiffness. The lumbar spine x-rays showed mild spurring at multiple levels. A cervical spine x-ray showed moderate neuroforaminal encroachment on the left at C5-6 and C6-7 and on the right at C6-7 and C7-T1. She was referred to pain management (Tr. 529-31). On November 3, 2009, Dr. Twining wrote that an MRI of the plaintiff's cervical spine on September 14, 2009, showed a mild broad-based bulge at C3-4 with deformity of the right lateral thecal sac and narrowing of the right neuroforamen, a mild broad-based bulge at C4-5, a hard disc bulge at C5-6, and flattening of the thecal sac and cervical cord with a narrowing of the neural foramen bilaterally (Tr. 535). The plaintiff was referred to pain management. Dr. Twining noted that the plaintiff had a positive straight leg raise test on the left (Tr. 534-35). After this visit, Dr. Twining consistently noted that the plaintiff was "doing well from this standpoint" under the care of Patricia Grant, M.D. (Tr. 427, 431, 472, 479, 490, 537, 544, 548, 552, 556).

On January 5, 2010, the plaintiff had pain in her left knee and right foot. She had a positive straight leg raise test on the left (Tr. 538). On March 30, 2010, the plaintiff had fullness of her left MCP joints (Tr. 542). On June 22, 2010, Dr. Twining wrote that the plaintiff was on an increased dosage of Methotrexate due to increased activity of her RA. The increased dosage helped her hands somewhat, but she still had significant pain and swelling in her feet (Tr. 545-48). On September 20, 2010, the plaintiff had pain and swelling

8

in her feet.  Her grip strength was not what it should be.  The Methotrexate made her nauseous, and she was switched to an injection of the medication (Tr. 556).  On November 12, 2010, the plaintiff had bilateral synovitis bilaterally, with pain in her thumb.  She also had pain in her left knee and shoulders (Tr. 424-27).

On March 21, 2011, the plaintiff reported pain in her left knee and both shoulders.  Both of her ankles exhibited some swelling and synovitis and were painful with range of motion.  She had significant iron deficiency (Tr. 469-72).  On May 18, 2011, the plaintiff was concerned that she had fibromyalgia.  She exhibited eight out of 18 tender points, which was suggestive of, but not necessarily diagnostic for fibromyalgia.  She had pain in her left knee and shoulder, and swelling in both ankles.  The plaintiff described poor sleep, fatigue, and chronic pain.  Neurontin was prescribed (Tr. 480).  On August 15, 2011, the plaintiff's hands demonstrated improving synovitis, but grip strength was poor, and she had synovitis in one foot.  She had pain in her left knee.  She could not tolerate the Methotrexate and was switched to Enbrel injections.  Neurontin was continued at 300mg (Tr. 487-91).

On August 15, 2011, Dr. Twining found that the plaintiff's cervical range of motion was normal, with full flexion and extension; her back was normal; she had left knee pain upon range of motion testing; and her shoulder range of motion was normal.  He also noted that the plaintiff's hands showed poor grip strength, but improving synovitis bilaterally (Tr. 488-89).

On October 14, 2011, Dr. Twining completed a medical statement noting that the plaintiff had a history of joint pain, joint swelling, joint tenderness, morning stiffness, synovial inflammation, limitation of motion in joints, radiographic changes typical of inflammatory arthritis, an inability to ambulate effectively, and an inability to perform fine and gross movements effectively.  The plaintiff had inflammation in her hands, wrists, and ankles bilaterally.  She had severe fatigue and malaise.  Dr. Twining opined that the plaintiff

9

had marked limitation of activities of daily living and marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace and moderate limitation in maintaining social functioning. He opined that she could stand for 15-30 minutes and sit for 30 minutes at one time.  The plaintiff could work for one hour per day, lift ten pounds on an occasional basis, and lift five pounds on a frequent basis.  She could occasionally bend, never stoop, and never perform fine manipulation in either hand.  She could occasionally perform gross manipulation in both hands and occasionally raise her arms over her shoulders.  The plaintiff had severe chronic active RA with decreased grip strength, pain, and fatigue. Dr. Twining wrote it was his opinion that the plaintiff was disabled due to RA, fibromyalgia, iron deficiency anemia, and osteoarthritis (Tr. 454-57).

On February 7, 2012, the plaintiff saw Dr. Twining for RA symptoms.  Her tender point exam for fibromyalgia was negative.  She had mild osteoarthritis in her thumbs, but good grip strength and no synovitis; normal knees; normal elbows; normal feet; grossly normal back, with no straight-leg raise; and normal, pain-free range of motion in both shoulders (Tr. 497).   Dr. Twining also noted that the plaintiff's symptoms did not include joint pain, swelling, redness, or warmth (Tr. 496).  Dr. Twining noted that the plaintiff had been off Enbrel for three weeks  and it was necessary to get Enbrel authorized because the plaintiff had increased stiffness and pain when she was not taking it (Tr. 497-98).  On April 23, 2012, the plaintiff was being treated with Enbrel injections, which lessened her stiffness and pain.  She had osteoarthritis deformity and pain in the joints of thumb, and her physical examination results were unchanged (Tr. 502-504).  On June 28, 2012, the plaintiff had symptoms of RA in her intraphalangeal joints, metacarpal phalangeal joints, wrist, elbow, shoulder, neck, back, hip, knee, ankle, and foot.  She experienced fatigue.  She had pain and deformity in her thumbs that was consistent with osteoarthritis.  She had swelling of her ankle with pitting edema bilaterally.  She was prescribed Augmentin in place of Enbrel (Tr. 506-09).

### *Bay Orthopaedic Associates - A. Mason Ahearn, M.D., F.A.C.S.*

On April 22, 2009, Dr. Ahearn evaluated the plaintiff at the request of the State agency. He observed that the plaintiff had a normal gait and stance; could walk on her toes and heels; could perform tandem and heel-toe walking; managed a half-squat before she had bilateral knee pain; had full cervical range of motion (with a sense of crepitation on both flexion and extension); had full range of motion in her upper extremities (except in her thumb tips); had good gross and fine mechanical dexterity; produced slight Tinel's and Phalen's signs; showed no muscular, sensory, or reflex changes in the upper or lower extremities; had full lumbar range of motion, with negative straight-leg raising; and had full range of motion in her lower extremities, without crepitation, warmth, or effusion (Tr. 361)). Dr. Ahearn concluded that plaintiff could not stand more than 15-20 minutes at a time, bend, stoop, crawl, kneel, climb, perform repetitive lifting, perform full-time data entry work, or engage in "rapid assembly line repetitive use of hands" (Tr. 362). She could do no single lifting over 30 pounds. He opined that the plaintiff could return to her past work as a pharmacy technician given these restrictions (*id.*). During the examination, the plaintiff expressed confidence that she could return to her former duties if she were offered a similar job, but she had not been able to find work in the field since her previous company closed (Tr. 360).

### *Myrtle Beach Endocrinology - Paul David Bunn, MD*

On September 22, 2009, Dr. Bunn saw the plaintiff and performed a thyroid ultrasound and biopsy. On October 26, 2009, Dr. Bunn diagnosed the plaintiff with goiter and prescribed Synthroid (Tr. 402).

### *Physical Residual Functional Capacity Assessments*

On December 14, 2010, Mary Lang, a non-examining State agency case reviewer, opined that the plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry ten pounds. She could stand, walk, and sit about six hours in an

11

eight-hour workday. She was limited to frequent push/pull hand controls and foot controls bilaterally. She could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl. She could frequently balance, but should never climb ladders, ropes, or scaffolds. She was limited to occasional bilateral upper extremities overhead reaching and limited to frequent use of the right upper extremity in handling and fingering. She should avoid even moderate exposure to extreme cold and wetness (Tr. 415-18). On June 9, 2011, Cleve Hutson, M.D., opined the same (Tr. 445-48).

### Hearing Testimony

At the video hearing on July 24, 2012, the plaintiff testified that she was 48 years old. She was not married, and she lived with her 13-year-old son. The plaintiff's mother paid her bills. She testified that she weighed 208 pounds. She had weighed 250 pounds when she was working. The plaintiff testified that she was diagnosed with RA in 2006. She was taking a Methotrexate injection for her RA that made her sick, and she could not eat. The plaintiff was right handed and had problems using her hands, including trouble writing, using a computer, and lifting anything heavy. She had those problems since 2006. The plaintiff had carpal tunnel surgery on her right hand in 2001. She had a driver's license, but she only drove short distances because her legs hurt when she drove. She had intermittent numbness and tingling in her fingers every day for a total of three hours each day. The plaintiff stated that she had these symptoms since she was diagnosed with carpal tunnel syndrome. The plaintiff lived in a mobile home and had trouble going up and down the four steps to enter and leave. She had to hold on to the railing because her feet and ankles hurt and her knees gave out on her. She had those problems since was diagnosed with RA. She had fallen twice (Tr. 41-44).

The plaintiff last worked in a pharmacy as a pharmacy tech and in medical records. She worked there approximately 19 years. She operated machinery at that job in order to package medicines for nursing homes. She ran the machine every day for about

an hour.  She carried cases of medical records and cases of papers, which weighed approximately 50 pounds.  She had to push and pull the records.  She was also required to bend, stoop, walk, sit, and stand (Tr. 44-45).

The plaintiff testified that her ankles and feet were swollen every day for eight hours.  She had to lie down.  She had to elevate her legs two hours a day.  The plaintiff also had problems with her neck.  When she turned her neck, her neck cracked and she had headaches.  Her neck problems made it more difficult to work at a computer.  She could work 15 minutes, and then she needed a 30 minute break.  She did not sleep well at night.  She had been taking Neurontin to help her sleep at night since 2011.  She did some housework with breaks.  The plaintiff testified that she could mop the kitchen for 15 minutes, and then she would need to rest for 30 minutes.  That was true of most household duties since 2006.  The plaintiff stated she could stand without leaning against something for about 30 minutes. She could sit for 30 minutes. She  could only walk half a block before she would have to stop and rest (Tr. 45-47).

The plaintiff testified that she saw Dr. Twining every three months since 2006. She was referred to Dr. Twining by her primary physician, Dr. Duvall.  She saw Dr. Duvall every six months.  The plaintiff reported that she had hearing problems since she was born. She had surgeries when she was young, and she did pretty well for a number of years.  In 2006, she started having problems hearing out of her left ear.  She had a hearing aid in her right ear.  She could not wear her left hearing aid because she had an ear infection, and her ear was always swollen.  The plaintiff said that she could not hear people standing behind her, if there were a lot of people, or if someone whispered.  She tried to read lips (Tr. 47-49).

The plaintiff testified that her RA had worsened since June 2008.  She was limited to what she could do around the house, and she had to take longer breaks. She was

13

on seven medications. She had sinus infections due to her Enbrel injections. She had to have her son help her lift anything heavy (Tr. 49-50).

The vocational expert classified the plaintiff's past work as that of medical records assistant, *Dictionary of Occupational Titles* ("*DOT*") No. 245.362-010, specific vocational preparation ("SVP") of 4, semi-skilled, light; and pharmacy tech, *DOT* No. 074.382-010, SVP of 3, semi-skilled, light.

During the hearing, the ALJ proposed the following hypothetical:

> Please assume a hypothetical worker the same age as the claimant, the same work background and education in a light exertional capacity. No climbing, crawling, or kneeling. No more than occasional fingering or fine manipulation with the dominant hand. Finally, a sit-stand option at will.

(Tr. 50). The ALJ found that the plaintiff could not perform her past relevant work (Tr. 29). The vocational expert further testified that the individual could perform work as a storage facility clerk, SVP of 2, unskilled, light, *DOT* No. 295.367-026, with 4,400 jobs regionally and 416,000 jobs nationally; machine tender, SVP of 2, unskilled, light, *DOT* No. 920.665-018, with 9,200 jobs regionally and 706,00 jobs nationally; and ticket taker, SVP of 2, unskilled, light, *DOT* No. 344.667-010, with 1,260 jobs regionally and 104,000 jobs nationally. The vocational expert testified that his testimony was consistent with the DOT and that he had professional knowledge of the sit-stand option (Tr. 50-51).

The plaintiff's attorney asked the vocational expert whether the cited jobs would be eliminated if the individual could never engage in fine manipulation with her right hand. The vocational expert stated that it would not eliminate any of them, stating that a ticket taker could use the non-dominant hand (Tr. 51). The plaintiff's attorney then asked the vocational expert whether the cited jobs would be eliminated if the individual was limited to no fine manipulation with the right hand, only occasional gross manipulation of the left hand and the right hand, and the occasional ability to raise her arm over shoulder level,

14

bilaterally. The vocational expert stated that it would eliminate the job of ticket taker, but not the storage facility clerk or the machine tender (Tr. 51-52). The attorney asked the vocational expert about the frequency of the need to manipulate or raise arms over shoulder height. The vocational expert stated that neither job required raising arms over shoulder height and that the job of storage facility clerk required the individual to hand someone a clipboard, and the machine tender just sat and watched a machine work. The vocational expert stated that these jobs were listed as light because of the standing requirement, but there was no lifting requirement (Tr. 52).

The attorney asked whether the cited jobs would be eliminated if the individual had inflammation of the left hand, right hand, left wrist, right wrist, left ankle and right ankle, which caused her to only be able to be on task for 15 minutes at a time and would require an unscheduled 30-minute break. The vocational expert testified that it would eliminate all jobs (Tr. 53). The attorney also asked if the identified jobs would be eliminated if the individual, due to swelling and numbness, had to elevate her legs for two hours a day and therefore would be off-task. The vocational expert testified that if an individual could elevate her legs to the level of a foot stool, employers would accommodate the limitation. If the individual had to elevate her legs to waist level, employers would not accommodate that limitation. If the individual were off-task during one-third of the day, it would eliminate all jobs in the national economy (Tr. 53).

The vocational expert also testified that an individual who suffered a hearing loss and could not hear people behind her or hear people if there was background noise, could not perform the job of storage facility clerk, but she could perform the job of machine tender (Tr. 53-54). Lastly, if the individual had an inability to ambulate effectively, which limited her ability to perform daily tasks, and she was unable to climb a few steps at a reasonable pace without the use of a single handrail, it would eliminate all jobs in the national economy (Tr. 54).

15

### ANALYSIS

The plaintiff was born on July 23, 1964, and she was 43 years old on her amended alleged disability onset date (June 23, 2008).  She was 48 years old on the date of the ALJ's decision (July 24, 2012).  She completed her education through the twelfth grade.  The plaintiff argues that the ALJ erred by (1)  failing to properly weigh the opinions of Dr. Twining and Dr. Ahearn; (2)  failing to explain his findings regarding her residual functional capacity ("RFC"); and, (3)  failing to properly assess her credibility (pl. brief 18-37).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5)  the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not
> well-supported by medically acceptable clinical and laboratory
> diagnostic techniques or is inconsistent with the other
> substantial evidence in the case record means only that the
> opinion is not entitled to "controlling weight," not that the
> opinion should be rejected.  Treating source medical opinions
> are still entitled to deference and must be weighed using all of
> the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In
> many cases, a treating source's medical opinion will be entitled
> to the greatest weight and should be adopted, even if it does
> not meet the test for controlling weight.

*Id.* at *4.

The plaintiff first argues that the ALJ improperly discounted the opinion of her treating physician, Dr. Twining (pl. brief at 20-28).  On June 23, 2008, Dr. Twining wrote a letter addressed "To whom it may concern," in which he opined that the plaintiff was disabled due to RA, which left her incapable of prolonged standing or walking, grasping, pulling, stooping, bending, heavy lifting, kneeling, or squatting (Tr. 333).  On October 14, 2011, Dr. Twining completed a medical statement noting the plaintiff had a history of joint pain, joint swelling, joint tenderness, morning stiffness, synovial inflammation, limitation of motion in joints, radiographic changes typical of inflammatory arthritis, an inability to ambulate effectively, and an inability to perform fine and gross movements effectively.  Dr. Twining opined that the plaintiff had marked limitation of activities of daily living and marked limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace and moderate limitation in maintaining social functioning.  He opined that she could stand for 15-30 minutes and sit for 30 minutes at one time.  The plaintiff could work for one hour per day, lift ten pounds on an occasional basis, and lift five pounds on a frequent basis.  She could occasionally bend, never stoop, and never perform fine manipulation in either hand.  She could occasionally perform gross manipulation in both hands and occasionally raise her arms over her shoulder.  The plaintiff had severe chronic active RA with decreased grip strength, pain, and fatigue.  Dr. Twining wrote it was his

opinion that the plaintiff was disabled due to RA, fibromyalgia, iron deficiency anemia, and osteoarthritis (Tr. 454-57).

The ALJ discussed the October 2011 opinion and found that it should be accorded "little weight" as it was not consistent with Dr. Twining's own treatment notes (Tr. 27-28).  The ALJ particularly noted the clinical findings of Dr. Twining during his August 2008 examination of the plaintiff (Tr. 28; *see* Tr. 520-21).  The plaintiff's fingers appeared normal; she had no synovitis in her hands bilaterally; her grip strength was normal; her cervical range of motion was normal, with full flexion/extension and rotation; she had no back abnormalities; her hip range of motion was normal; her knee range of motion was normal; her ankle was normal; her muscle strength was 5/5 in all groups tested; her muscle tone was normal; her deep-tendon reflexes were normal; and she had no neurological deficits (Tr. 520-21).  Findings in the plaintiff's previous examination in May 2008 had been the same (Tr. 516-17).

The plaintiff attempts to minimize the significance of her August 2008 examination with Dr. Twining by pointing out that the visit "occurred long before [she] had actually applied for disability benefits" (pl. brief at 21-22).  However, the plaintiff's amended alleged disability onset date is June 23, 2008,[3] and thus the August 2008 examination findings are relevant.

The plaintiff now concedes "that substantial evidence supports the Commissioner's decision for the earliest part of the period in question" (pl. brief at 22; *see id.* at 18, 27-28).  However, the plaintiff argues that her condition thereafter deteriorated, and thus Dr. Twining's October 2011 opinion was well supported from "approximately the time of her cervical MRI" in September 2009 (*id.* at 27-28).  By admitting that substantial

---

[3]The plaintiff originally alleged a disability onset date of November 1, 2006, in her applications (Tr. 157, 164).  However, at the hearing, the plaintiff amended her alleged onset date of disability to June 23, 2008 (Tr. 247-48).

evidence supports the ALJ's decision through at least September 2009, the plaintiff effectively concedes that Dr. Twining's June 23, 2008, opinion that she was disabled conflicts with substantial evidence in the record, including Dr. Twining's own treatment notes (*see* Tr. 333, 516-17, 519-21).  As argued by the Commissioner, Dr. Twining's willingness to provide an opinion that contradicts his own treatment notes casts doubt on his ability to make a reliable and impartial assessment of the plaintiff's functional capacity. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that a treating physician's opinion is entitled to diminished weight if it is unsupported by objective evidence or is inconsistent with other substantial evidence, including the physician's own treatment notes).

At the examination of the plaintiff in August 2011, which was closest to Dr. Twining's October 2011 opinion, Dr. Twining found that the plaintiff's cervical range of motion was normal, with full flexion and extension; her back was normal; she had left-knee pain upon range-of-motion testing; and her shoulder range of motion was normal (Tr. 488-89).  He also noted that the plaintiff's hands showed poor grip strength, but improving synovitis bilaterally (*id*.).  In evaluating Dr. Twining's October 2011 opinion, the ALJ cited Dr. Twining's findings during a February 2012 examination of the plaintiff, just four months after the October 2011 opinion, in which Dr. Twining noted that the plaintiff had mild osteoarthritis in her thumbs, but good grip strength and no synovitis; normal knees; normal elbows; normal feet; a grossly normal back, with no straight-leg raise; negative tender point testing for fibromyalgia; and normal, pain-free range of motion in both shoulders (Tr. 28; *see* Tr. 497).  Dr. Twining also noted that the plaintiff's symptoms did not include joint pain, swelling, redness, or warmth (Tr. 496).  As the ALJ explained (Tr. 25), that observation appears to contradict Dr. Twining's statement in the same progress note that the plaintiff's "[s]ymptoms are located in the proximal intraphalangeal joint(s), metacarpal phalangeal joint(s), wrist, elbow, shoulder, neck, back, hip knee, ankle and foot" (Tr. 496)/  Also as noted by the ALJ, in April 2012, the plaintiff reported that she was "doing well" on Embrel

and that she was experiencing less stiffness and pain (Tr. 28; *see* Tr. 502-504).   The plaintiff's physical examination results at that time remained unchanged (Tr. 497, 503-04).

Here, the ALJ considered the evidence and gave good reasons for not giving Dr. Twining's opinion controlling weight (Tr. 25-28).  In addition to the evidence discussed above, the ALJ correctly noted that Dr. Twining's opinion that the plaintiff was disabled does not qualify as a "medical opinion" and, therefore, it is not entitled to controlling weight or any special significance under the Commissioner's regulations (Tr. 28; *see* Tr. 457). *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (explaining that a medical source's opinion that a claimant is "disabled" or "unable to work" is not a "medical opinion," but rather is an administrative finding on an issue reserved to the Commissioner); SSR 96-5p, 1996 WL 374183, at *5 (stating that opinions on issues reserved to the Commissioner "can never be entitled to controlling weight or given special significance").  Based upon the foregoing, the undersigned finds that the ALJ did not err in determining that Dr. Twining's opinion was not entitled to controlling weight.  However, as will be explained below, the undersigned further finds that the ALJ failed to adequately explain his findings as to the plaintiff's manipulative limitations in the RFC assessment, and, therefore, Dr. Twining's October 2011 should be considered in addition to the other evidence of record upon remand.

The plaintiff further argues that the ALJ should have adopted examining physician Dr. Ahearn's proposed restrictions on bending, stooping, climbing stairs[4], repetitive lifting, and assembly-line use of hands (pl. brief at 30-31).  Dr. Ahearn evaluated the plaintiff at the request of the State agency and concluded that she could not stand more than 15-20 minutes at a time, bend, stoop, crawl, kneel, climb, perform repetitive lifting, perform full-time data entry work, or engage in "rapid assembly line repetitive use of hands.

---

[4]The plaintiff's argument that the ALJ failed to include Dr. Ahearn's prohibition on climbing stairs (pl. brief at 30) is without merit as the ALJ specifically found in the RFC assessment that the plaintiff "cannot climb" (Tr. 24).

She could do no single lifting over 30 pounds.  He opined that the plaintiff could return to her past work as a pharmacy technician given these restrictions (Tr. 360-62).

The ALJ gave "considerable weight" to Dr. Ahearn's opinion and explained his reasons for not adopting the limitation finding the plaintiff could not stand for more than 15-20 minutes at a time.  Specifically, the ALJ noted that Dr. Ahearn's own examination showed the plaintiff had no muscular, sensory, or reflex changes in her lower extremities, as well as a normal unassisted gait and station (Tr. 27).  The ALJ did not provide his reasons for not adopting the limitations on bending, stooping, repetitive lifting, and assembly-line use of hands (Tr. 24-28).

The Commissioner notes that the ALJ accorded "significant weight" to the opinions of the State agency physicians, who expressly considered Dr. Ahearn's findings and determined that they did not preclude a reduced range of light work (Tr. 26-27 (citing Tr. 414-21, 444-51)).  While this is true, these same State agency physicians found the plaintiff was limited to reaching overhead occasionally with both upper extremities and handling (gross manipulation) frequently with the right upper extremity (Tr. 417, 447). However, the only manipulative limitations assessed by the ALJ were "occasional fingering [and] fine manipulation with her dominant [right] hand" (Tr. 24). The ALJ did not provide any reasons for not including the manipulative restrictions found by the State agency physicians, despite giving the opinions significant weight.[5] The Commissioner argues that any oversight in this regard was harmless, because none of the three representative jobs identified by the vocational expert require more than frequent handling (def. brief at 13-14).    The

---

[5]At the fifth step of the sequential evaluation process, the ALJ noted that the vocational expert testified that if the plaintiff was limited to no fine manipulation with her right hand, occasional gross left hand manipulation, and occasional reaching over shoulder level, the occupation of ticket taker would be eliminated, but not the occupations of storage facility clerk and machine tender (Tr. 30). The ALJ further stated that, nonetheless, "the objective medical evidence does not suggest that the claimant requires such limitation" (Tr. 30). No further explanation was provided.

Commissioner relies on the *Dictionary of Occupational Titles* ("*DOT*") and its companion publication, the *Selected Characteristics of Occupations* ("*SCO*"), for occupational information. *See* 20 C.F.R. § 404.1566(d)(1) (stating that ALJs may take notice of reliable job information from various publications, including *DOT*); SSR 00-4p, 2000 WL 1898704, at *2 (acknowledging agency's reliance on *DOT* and *SCO* for information about national work requirements). However, these same jobs cited by the Commissioner require frequent reaching, while the State agency physicians limited the plaintiff to occasional reaching overhead with both upper extremities. *See DOT* No. 295.367-026 (storage facility clerk), 1991 WL 672594; *DOT* No. 920.685-018 (machine tender), 1991 WL 687927; *DOT* No. 344.667-010 (ticket taker), 1991 WL 672863. While the ALJ noted that the vocational expert testified that the positions of storage facility clerk and machine tender did not require more than occasional reaching over shoulder level (Tr. 30; *see* Tr. 52), there is no reasonable explanation in the record for the apparent conflict between the vocational expert's testimony and the information provided in the *DOT*. *See* SSR 00-4p, 2000 WL 1898704, at *4 (providing that when a vocational expert provides evidence about the requirements of a job that appears to conflict with the *DOT*, the adjudicator must obtain a reasonable explanation for the apparent conflict). Accordingly, reliance on the vocational expert's testimony to support a finding of harmless error as to the ALJ's failure to include these manipulative limitations in the RFC assessment would be inappropriate.

Here, the ALJ failed to adequately explain his findings with regard to the plaintiff's manipulative limitations. As discussed above, the plaintiff's treating physician, Dr. Twining, whose opinion was given limited weight, found the plaintiff could never perform fine manipulation in either hand, could occasionally perform gross manipulation in both hands, and could occasionally raise her arms over her shoulder (Tr. 454-57). Examining physician Dr. Ahearn, whose opinion was given considerable weight, found that the plaintiff could not perform repetitive lifting, perform full-time data entry work, or engage in "rapid assembly line

22

repetitive use of hands" (Tr. 362). The State agency physicians, whose opinions were given significant weight, limited the plaintiff to reaching overhead occasionally with both upper extremities and handling (gross manipulation) frequently with the right upper extremity (Tr. 417, 447). However, the only manipulative limitations assessed by the ALJ were "occasional fingering [and] fine manipulation with her dominant [right] hand" (Tr. 24). Given these medical opinions, the undersigned finds that the ALJ should be instructed, upon remand, to include in the RFC assessment a discussion of why these opinions as to the plaintiff's functional restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. *See* SSR 96-8p, 1996 WL 374184, at *7. The ALJ should also explain his reasons for not including the postural limitations imposed by Dr. Ahearn (Tr. 362 (limitations to no bending, stooping, or repetitive lifting not included in RFC assessment)) and the State agency physicians (Tr. 416, 446 (limitations to frequent balancing and occasional stooping and crouching not included in RFC assessment)).

In light of the court's recommendation that this matter be remanded for further consideration, the plaintiff's remaining allegation of error will not be considered. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, if needed, consideration should also be given to the plaintiff's allegation that the ALJ failed to properly evaluate her credibility. Moreover, the undersigned recommends that the plaintiff's alleged disability onset date be amended to September 14, 2009, based upon the plaintiff's admission that substantial evidence supports the ALJ's decision to that date (pl. brief at 18, 22, 27-28 (citing Tr. 368, 9/14/09 cervical MRI)).

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 22, 2014
Greenville, South Carolina